UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cr 25-483 DSD |
| | **INFORMATION** |
| Plaintiff, | 18 U.S.C. § 1343 |
| | 18 U.S.C. § 981(a)(1)(C) |
| v. | 21 U.S.C. § 853(p) |
| | 28 U.S.C. § 2461(c) |
| 1. ANTHONY WADDELL JEFFERSON, and | |
| 2. LESTER BROWN, | |
| Defendants. | |

THE UNITED STATES ATTORNEY CHARGES THAT:

At times relevant to this Information:

1.      The defendant devised and carried out a scheme to defraud Minnesota's Housing Stability Services Program, a Medicaid program designed to help people with disabilities and addictions find and maintain housing. Rather than provide such help, the defendants obtained and misappropriated millions of dollars in program funds that were intended as reimbursements for services provided to those people.

   A.   **Background on Minnesota's Housing Stability Services Program**

2.      In July 2020, Minnesota became the first state in the country to offer Medicaid coverage for Housing Stabilization Services. The Housing Stabilization Services Program is a Medical Assistance (that is, Medicaid) benefit designed to help people with disabilities, including seniors and people with mental illnesses and substance use disorders, find and maintain housing.

3.      The Program permitted reimbursements for four principal kinds of services:

SCANNED
DEC 17 2025
U.S. DISTRICT COURT MPLS

    (a) Housing consultation, during which a consultant (like a social worker or nurse) helps a beneficiary complete a Department of Human Services form called a "Person-Centered, Housing Focused Plan." The Plan is a form available from the Department of Human Services. It requires minimal information. Consultants can bill Medicaid about $174 for a consulting session.

    (b) Housing transition services, during which a provider helps a beneficiary plan for, find, and move into housing. Providers can bill about $68 per hour of transition services provided.

    (c) Housing sustaining services, during which a provider helps a beneficiary keep their housing after they have moved in (including through behavioral management of the beneficiary). For sustaining services, too, providers can bill about $68 per hour.

    (d) Moving expenses of up to $3,000, subject to conditions.

4. By design, the Program had a low barrier to entry for new providers. A would-be provider needed only be at least 18 years old, submit some enrollment paperwork to Minnesota Department of Human Services, undergo a background check, and complete about five hours of online training videos. Providers did not have to have a medical license or social work training.

5. Similarly, the Program had a low barrier to entry for beneficiaries. Beneficiaries needed only be at least 18 years old, have coverage under Medical Assistance (which is Minnesota's Medicaid program for people with low income), have a documented disability or "disabling condition," and be experiencing housing instability. Program rules defined those final two conditions expansively. To receive billable services, a beneficiary meeting these requirements just needed to complete, with a Program-qualified consultant, a document called a Housing Focused Plan,

detailing their housing challenges and needs. That done, the beneficiary could enroll with a provider. And the provider could start billing for services provided.

6. To bill, a provider needed only to submit the names of the beneficiaries serviced, the types of billable services provided, and the hours worked.

7. The HSS Program's low barriers to entry and minimal records requirements for reimbursement combined to make the Program susceptible to fraud.

8. Before the Program's inaugural year, DHS predicted the Program would cost about $2.6 million annually. That proved to be inaccurate. In 2021 alone, the Program paid out more than $21 million in claims. That figure ballooned in the following years: $42 million in 2022, $74 million in 2023, $104 million in 2024. In just the first six months of 2025, the Program paid out another $61 million.

9. A federal investigation revealed that many Program providers defrauded the system. These providers acquired the names of Program-eligible beneficiaries from facilities like addiction treatment centers. They then used those individuals' information to submit inflated and fake reimbursement claims. In this fashion, the providers acquired substantial payouts of taxpayer money to which they were not entitled. They used those ill-gotten gains for their own enrichment.

**B.   The Defendants and Their Roles**

10. The defendants ANTHONY WADDELL JEFFERSON and LESTER BROWN lived in Philadelphia, Pennsylvania. They had a shared associate—Individual A. In or about December 2021, Individual A informed Jefferson, Brown, and two other shared associates—Individuals B and C—that she had heard that Minnesota's HSS Program was a good opportunity to make money.

*United States v. Jefferson, et al.*

11. JEFFERSON, BROWN, and Individuals A, B, and C each decided to become Minnesota HSS Providers, despite all living on the other side of the country and having no network in or connections to Minnesota or its communities. Ultimately, their sole connection to Minnesota was their fraudulent participation in the Housing Stabilization Services program.

12. On or about February 1, 2022, each of those five individuals filed corporate registration paperwork with the Minnesota Secretary of State. Each then submitted paperwork to enroll in the HSS Program through their newly registered Minnesota companies. And each of those companies then billed the HSS Program for hundreds and hundreds of hours of purported services.

13. JEFFERSON registered in Minnesota an entity he had previously created in Pennsylvania. It was called Chozen Runner LLC. BROWN also registered in Minnesota an entity he had previously created in Pennsylvania. It was called Retsel Real Estate LLC. Through Chozen Runner and Retsel, JEFFERSON and BROWN participated in the Housing Stability Services Program as service providers. In those roles, JEFFERSON and BROWN were supposed to provide housing consulting, transitioning, and sustaining services to qualifying people in need. Chozen Runner and Retsel were paid at quarter-hourly rates and with Medicaid dollars based on the services they claimed to provide.

**The Scheme to Defraud the Housing Stability Services Program**

14. From in or about February 2022 through in or about November 2025, in the State and District of Minnesota, and elsewhere, the defendants,

*United States v. Jefferson, et al.*

**ANTHONY WADDELL JEFFERSON**, and
**LESTER BROWN**,

and others known and unknown, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

15. The purpose of the scheme was to fraudulently obtain millions of dollars in Housing Stability Services Program funds by causing the submission of fake and inflated bills. As Program providers, JEFFERSON and BROWN were responsible for providing program-eligible housing services to people in need. However, in furtherance of the scheme, JEFFERSON, BROWN, and their conspirators caused the submission of false claims information that significantly overrepresented the hours of services they provided. In so doing, JEFFERSON and BROWN received HSS Program funds that substantially exceeded the services they provided.

16. In furtherance of the scheme to defraud, in or about February 2022, JEFFERSON applied to enroll Chozen Runner and BROWN applied to enroll Retsel as HSS Providers. Both defendants then purported to service individuals in need from rented office spaces in a building in downtown Minneapolis.

17. JEFFERSON and BROWN repeatedly flew together from Philadelphia to Minneapolis for the purpose of recruiting beneficiaries for their companies. They visited shelters and Section 8 housing facilities, marketing themselves as "The Housing Guys." JEFFERSON and BROWN often "consulted in" one another's HSS beneficiaries—Chozen consulting for Retsel and Retsel for Chozen.

*United States v. Jefferson, et al.*

18.  JEFFERSON and BROWN then used the beneficiary names they acquired to bill the HSS Program. From the beginning, JEFFERSON and BROWN fraudulently submitted bills exceeding the services their companies provided.

19.  To further the scheme, JEFFERSON hired family members and associates to work as Chozen Runner employees. At JEFFERSON's direction, some of those employees created fake client notes purporting to document HSS services provided by Chozen Runner. Much of that fake documentation was created to satisfy records requests from one or more insurance companies responsible for paying out Chozen Runner's HSS bills. In some of that documentation, JEFFERSON invented fake employees whose names he used to sign off on client notes.

20.  Also to further the scheme, BROWN and JEFFERSON worked together to submit fraudulent Program claims. At Retsel, BROWN sometimes billed close to the maximum hours permitted for a single beneficiary under the Program. He did so to maximize payments to Retsel from the Program even when he knew such claims exceeded the services actually provided. BROWN generally did not keep client notes, despite being required by Program rules to do so. When insurance representatives sought that documentation from Retsel, BROWN made up fake notes to satisfy the requests.

21.  Ultimately, Chozen Runner and Retsel submitted about $3.5 million in HSS claims for services purportedly provided to about 230 beneficiaries.

## Count 1
### (Wire Fraud)

22. Paragraphs 1 through 21 are incorporated herein.

23. From in or about February 2022 through in or about November 2025, in the State and District of Minnesota, and elsewhere, the defendants, as set forth below, and others known and unknown, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

24. On or about the date listed below, in the State and District of Minnesota and elsewhere, the defendants, as set forth below, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, including the following:

| Count | Date (on or about) | Wire Details |
|---|---|---|
| 1 | March 13, 2024 | An email from LESTER BROWN to ANTHONY JEFFERSON attaching client notes reflecting purported HSS services provided to L. Payton. |

All in violation of Title 18, United States Code, Section 1343.

### FORFEITURE ALLEGATIONS

25. Count 1 of this Information is incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c).

*United States v. Jefferson, et al.*

26. If convicted of Count 1 of this Information, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the count(s) of conviction.

27. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c).

Dated: December 17, 2025

DANIEL N. ROSEN
United States Attorney

*/s/ Daniel W. Bobier*
JOSEPH H. THOMPSON
DANIEL W. BOBIER
MATTHEW C. MURPHY
Assistant U.S. Attorneys